UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAWNTA AIKEN,<br><br>               Plaintiff<br><br>     v.<br><br>DIRECTOR OF THE FEDERAL BUREAU OF PRISONS, *et al.*,<br><br>               Defendants. | Civil Action No. 20-cv-2091 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

Plaintiff Shawnta Aiken, who was formerly incarcerated at Federal Prison Camp, Alderson ("FPC Alderson") in Alderson, West Virginia, brings the instant lawsuit against the Director of the Bureau of Prisons ("BOP"); the Warden of FPC Alderson, David Wilson; and Jerrod Grimes, at the time a Captain at FPC Alderson.  She alleges that Grimes sexually harassed her for approximately nine months, from January 2017 to September 2017, and attempted to rape her in September 2017, Compl. ¶¶ 14–28, ECF No. 1, and claims that Grimes, Wilson, and BOP have violated common law, the Eighth Amendment to the U.S. Constitution, and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq.  See generally* Compl.; *see also infra* Part I.B.  Defendants Wilson and BOP (together the federal defendants) have filed the pending Motion to Transfer ("Federal Defs.' Mot."), ECF No. 15, arguing that plaintiff's lawsuit should be transferred to the Southern District of West Virginia ("S.D.W.V."), the federal judicial district in which FPC Alderson is located, because that district is the locus of the facts, evidence, and witnesses relevant to the instant case, and because adjudication of plaintiff's FTCA claims will require application of West Virginia state law.  For the following reasons, defendant's Motion to Transfer is denied.

1

**I.      BACKGROUND**

A brief overview of plaintiff's disturbing factual allegations is followed by discussion of the procedural history of the instant case.

**A.      Factual Background**

In 2017, plaintiff, a resident of the District of Columbia, Compl. ¶ 8, was incarcerated at FPC Alderson in Alderson, West Virginia, *id.* ¶¶ 1–2.  In January 2017, Grimes, a BOP Captain at FPC Alderson, began verbally sexually harassing plaintiff on a daily basis, *id.* ¶¶ 2, 15.  Such harassment took the form of sexually explicit comments, such as "If I could get you alone . . ." and "If you give me a chance . . . ," *id.* ¶ 16, as well as near-daily comments about plaintiff's appearance and body, *id.* ¶ 17.  This alleged conduct continued for at least nine months.  *See id.* ¶¶ 18–19.

Grimes's alleged harassment of plaintiff escalated to sexual assault.  One evening in late September 2017, at approximately 8:00 PM, Grimes called plaintiff into his office—a command that, as an inmate, plaintiff had no choice but to obey.  *Id.* ¶ 18.  The guard normally stationed at a booth in the hallway outside Grimes's office was absent, and when plaintiff arrived alone at Grimes's office, the lights in the office were dimmed, the blinds were closed, and Grimes was the only other person there.  *Id.* ¶ 21.  As plaintiff entered, he told her, "You know why I called you down here," and showed her a write-up she had received regarding an altercation with another incarcerated person earlier that day.  *Id.* ¶ 22.  Grimes then told plaintiff, "If you want some dick, you should've just told me," and then unbuttoned his pants, exposing himself to plaintiff, and began kissing and groping her, *id.* ¶ 23.  Plaintiff tried to escape Grimes's office, but he grabbed her by the shoulders, threw her face-down onto a table in his office, and partially removed her pants, while plaintiff screamed for him to stop.  *Id.* ¶¶ 24–25.  A guard heard

2

plaintiff's shouts and knocked on the door to Grimes's office, which gave plaintiff an opportunity to escape. *Id.* ¶ 27.

Plaintiff further alleges that she "was not the only female inmate subjected to sexual abuse and harassment" by Grimes, *id.* ¶ 29, and Grimes has acknowledged as much. In the course of subsequently pleading guilty to a thirteen-count federal indictment, including ten charges of sexual abuse of a ward and three charges of abusive sexual contact involving a ward, Grimes admitted that he engaged in sexual intercourse with multiple female inmates on several occasions between April 2017 and December 2017, including at least once at the Warden's house at FPC Alderson. *Id.* ¶¶ 29–32; *see also* Indictment, ECF No. 7, *United States v. Grimes*, No. 5:18-cr-00069 (S.D.W. Va.).[1] Plaintiff also claims that, in addition to Grimes, "many other correctional officers also sexually abused, harassed, and/or engaged in sexual contact with the female inmates" at FPC Alderson. *Id.* ¶ 33. She alleges that "[t]his abusive culture of sexual abuse, harassment, and/or sexual contact between officers and inmates was widespread and well known to FPC Alderson inmates and FPC Alderson employees." *Id.* ¶ 34. Despite being aware of these abuses, Wilson, the Warden at FPC Alderson, "failed to take the necessary actions to protect the inmates within [their] care and custody" from the prison guards themselves, including failing to report and investigate allegations of sexual assault and failing to discipline prison guards found to have sexually assaulted inmates. *Id.* ¶ 35.

Finally, according to plaintiff, BOP itself was aware of the criminal misconduct being perpetrated by FPC Alderson prison guards on female inmates, because it received formal complaints from some of those inmates who were, like plaintiff, Grimes's victims. *Id.* ¶ 36. For

---

[1] Grimes is currently serving a twelve-year prison sentence at Federal Correctional Institute—Backstrop, in Backstrop, Texas. *See* Judgment, ECF No. 60, *United States v. Grimes*, No. 5:18-cr-00069 (S.D.W. Va.); *Federal Inmates by Name: Jerrod Grimes*, BUREAU OF PRISONS, https://www.bop.gov/mobile/find_inmate/ (last visited Apr. 15, 2021).

instance, C.L., an inmate at FPC Alderson, was raped by Grimes in April 2017 and filed a formal administrative grievance shortly thereafter. *Id.* ¶ 37.[2] In April 2017, V.J., another FPC Alderson inmate, filed a formal complaint that described an instance of sexual harassment or assault and also explained that victims of Grimes were "scared of retaliation" and warned not to pursue their complaints because Grimes "had just had 'a bad day.'" *Id.* ¶ 38.[3] Despite thus being on notice of a systemic sexual-assault problem at FPC Alderson, plaintiff alleges that BOP failed to ensure that FPC Alderson leadership and guards were complying with BOP's strict sexual-assault-prevention regulations, promulgated pursuant to the Prison Rape Elimination Act, 34 U.S.C. §§ 30301 *et seq.* *See* Compl. ¶¶ 42–59.

### B.     Procedural Background

Plaintiff filed the instant lawsuit on July 31, 2020. She alleges that her sexual assault by Grimes constituted assault and battery (Counts Six and Eight, *id.* ¶¶ 127–31, 137–40), intentional infliction of emotional distress (Count Ten, *id.* ¶¶ 149–55), negligent infliction of emotional distress (Count Twelve, *id.* ¶¶ 164–70), all common law violations, as well as cruel and unusual punishment, in violation of the Eighth Amendment to the U.S. Constitution (Count Two, *id.* ¶¶ 92–101). She further alleges that in failing to protect her from sexual assault and failing to enforce BOP's sexual-harassment and -assault policies and to train FPC Alderson employees concerning those policies, Wilson and BOP violated the Eighth Amendment (Count One, *id.* ¶¶ 71–91), and committed six distinct violations of the FTCA, namely negligence (Count Three, *id.* ¶¶ 102–10), negligent hiring, training, retention, and supervision (Count Four, *id.* ¶¶ 111–20),

---

[2]     Plaintiff has identified other FPC Alderson inmates using pseudonyms to protect their privacy and anonymity as victims of sexual abuse, and the Court will do the same.

[3]     V.J.'s administrative complaint was denied by BOP because she filed it directly with BOP, rather than filing it first through FPC Alderson. Compl. ¶ 38. The ultimate resolution of C.L.'s administrative complaint is not clear from the record.

4

assault (Count Five, *id.* ¶¶ 121–26), battery (Count Seven, *id.* ¶¶ 132–36), intentional infliction of emotional distress (Count Nine, *id.* ¶¶ 141–48), and negligent infliction of emotional distress (Count Eleven, *id.* ¶¶ 156–63).  Plaintiff seeks $1,000,000 in compensatory damages, plus punitive damages, costs, and attorney's fees.  *See id.* at 33.

On February 26, 2021, before filing an answer, the federal defendants filed a motion to transfer plaintiff's lawsuit to S.D.W.V.  *See* Federal Defs.' Mot.  That motion has been thoroughly briefed, *see* Federal Defs.' Mem. Supp. Mot. Transfer ("Federal Defs.' Mem."), ECF No. 15-1; Pl.'s Opp'n Federal Defs.' Mot. Transfer ("Pl.'s Opp'n"), ECF No. 17; Federal Defs.' Reply Supp. Mot. Transfer ("Federal Defs.' Reply"), ECF No. 18; Pl.'s Surreply Opp'n Federal Defs.' Mot. Transfer ("Pl.'s Surreply"), ECF No. 21, and is now ripe for resolution.

## II.   LEGAL STANDARD

A case may be transferred to any district where venue is also proper "[f]or the convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a); *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 59 (2013) ("§ 1404(a) does not condition transfer on the initial forum's being 'wrong' . . . it permits transfer to any district where venue is also proper (*i.e.*, 'where [the case] might have been brought') or to any other district to which the parties have agreed by contract or stipulation.").  The Supreme Court has explained that "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).  "The decision whether a transfer or a dismissal is in the interest of justice . . . rests within the sound discretion of the district court," *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 789 (D.C. Cir. 1983), which discretion "is broad" but "not

untrammeled." *Fine v. McGuire*, 433 F.2d 499, 501 (D.C. Cir. 1970); *see also In re Scott*, 709 F.2d 717, 720 (D.C. Cir. 1983) ("[T]here are limits to the broad discretion accorded courts under section 1404(a).").

"[T]ransfer in derogation of properly laid venue" in the District of Columbia "must . . . be justified by particular circumstances that render the transferor forum inappropriate by reference to the considerations specified in that statute." *Starnes v. McGuire*, 512 F.2d 918, 925 (D.C. Cir. 1974). "Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient," *Van Dusen*, 376 U.S. at 645–46, and the movant bears the burden of persuasion that transfer of an action is proper, *see SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1154 (D.C. Cir. 1978) (*citing Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966)); *see also, e.g.*, *City of W. Palm Beach v. U.S. Army Corps of Eng'rs*, 317 F. Supp. 3d 150, 153 (D.D.C. 2018).

## III.  DISCUSSION

The first step in resolving a motion for transfer of venue under § 1404(a) is to determine whether the proposed transferee district is one where the action "might have been brought." 28 U.S.C. § 1404(a); *Atl. Marine*, 571 U.S. at 59; *Jones v. Gasch*, 404 F.2d 1231, 1237 n.25 (D.C. Cir. 1967) ("[C]ivil cases may be transferred only to a district or division wherein jurisdiction and proper venue obtain."). Plaintiff's FTCA claims against the federal defendants may be brought "only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402(b). Her Eighth Amendment claim against the federal defendants is governed by the general venue statute, which provides that in actions raising a federal question by naming as a defendant a federal agency or United States official in his or her official capacity, venue is proper in any judicial district where (1) "a defendant in the

action resides;" (2) "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;" or (3) a "plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1).

The conduct primarily at issue in this case occurred in S.D.W.V. and thus both plaintiff's Eight Amendment and FTCA claims may have been brought in that district. Wisely, then, plaintiff "does not dispute that she could have brought this case in the Southern District of West Virginia." Pl.'s Opp'n at 4 n.1 (emphasis omitted). Having cleared that first hurdle, consideration of which forum best serves the convenience of the parties and witnesses and the interest of justice is the focus of the remainder of this discussion. *See* 28 U.S.C. § 1404(a).

In resolving motions to transfer venue under Section 1404(a), courts have analyzed several private- and public-interest factors, which elucidate the concerns implicated by the two express statutory factors of the "convenience of parties and witnesses" and "the interest of justice." 28 U.S.C. § 1404(a); *see, e.g.*, *Stewart Org.*, 487 U.S. at 29 (noting that motion to transfer under this statute "calls on the district court to weigh in the balance a number of case-specific factors"); *accord Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947) (outlining public and private interests to be considered in the analogous *forum non conveniens* inquiry). The private-interest factors are addressed first, followed by the public-interest factors.

### A. Analysis of Private-Interest Factors

Six private-interest factors are generally employed by this Court to assess the "convenience of parties and witnesses," 28 U.S.C. § 1404(a): "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; [and] (6) the ease of access to sources of proof." *Md. Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 95 (D.D.C. 2019); *see also Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996) (first articulating these

factors).[4]  The first factor, plaintiff's choice of forum, is particularly important, as "the D.C. Circuit has long held that 'a plaintiff's choice of forum will rarely be disturbed . . . unless the balance of convenience is strongly in favor of the defendant.'"  *Rossville Convenience & Gas, Inc. v. Barr*, 453 F. Supp. 3d 380, 387 (D.D.C. 2020) (omission in original) (quoting *Gross v. Owen*, 221 F.2d 94, 95 (D.C. Cir. 1955)); *see also H & R Block v. United States*, 789 F. Supp. 2d 74, 79 (D.D.C. 2011) ("[A] plaintiff's choice of forum is ordinarily 'a paramount consideration' that is entitled to 'great deference' in the transfer inquiry." (alteration in original) (quoting *FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 26, (D.D.C. 2008))); *Pain v. United Techs. Corp.*, 637 F.2d 775, 783 (D.C. Cir. 1980) ("[A] trial judge must give considerable, but not conclusive, weight to the plaintiff's initial forum choice."), *overruled in part on other grounds by Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981).  Thus, a defendant seeking to transfer a case to another jurisdiction must "establish that the added convenience and justice of litigating in its chosen forum overcomes the deference ordinarily given to the plaintiff's choice."  *Rossville*, 453 F. Supp. 3d at 387 (quoting *Sheffer v. Novartis Pharms. Corp.*, 873 F. Supp. 2d 371, 376 (D.D.C. 2012)).  Analysis of these factors here weighs against transfer.

With respect to the first private-interest factor, the plaintiff's preferred forum, the federal defendants "recognize[] that a plaintiff's choice of forum usually is entitled to deference," Federal Defs.' Mem. at 6, but argue that such deference should be "minimal" here because there is "little factual nexus" between plaintiff's claims and her chosen district, *id.* (quoting *United States v. Bollinger Shipyards, Inc.*, Civ. A. No. 11-1388 (RBW), 2012 WL 12987042, at *3–4 (D.D.C. Mar. 30, 2012)).  The federal defendants overreach, however, in contending that

---

[4] These factors are regularly used by this Court without being expressly condoned by the Supreme Court or the D.C. Circuit, and appears to have been adopted from legal treatises and decisions in other Circuits.  *See Trout Unlimited*, 944 F. Supp. 13 at 16 & nn.4–9.  The parties agree that these factors govern the private-interest inquiry.  *See* Federal Defs.' Mem. at 3; Pl.'s Opp'n at 3–4.

plaintiff's "claims have *no* meaningful connection with this district," *id.* at 6 (emphasis added), as the instant case in fact has at least two connections to this District. First, most obviously, plaintiff resides in the District of Columbia. *See, e.g.*, *Reifflin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 52 (D.D.C. 2000) ("Deference to the plaintiff's choice of forum is particularly strong where the plaintiff has chosen [her] home forum."); *FHFA v. First Tenn. Bank Nat'l Ass'n*, 856 F. Supp. 2d 186, 192 (D.D.C. 2012) ("[T]he plaintiffs' choice of forum is frequently accorded deference, particularly where the plaintiffs have chosen their home forum . . . ." (quoting *New Hope Power Co. v. U.S. Army Corps of Eng'rs*, 724 F. Supp. 2d 90, 95 (D.D.C. 2010))). Although courts will afford a plaintiff's choice of forum less deference when she "chooses a forum that is not [her] home forum," *State v. U.S. Army Corps of Eng'rs*, 304 F. Supp. 3d 56, 63 (D.D.C. 2018) (quoting *Niagara Pres., Coal., Inc. v. FERC*, 956 F. Supp. 2d 99, 104 (D.D.C. 2013)), that consideration has no bearing here. Plaintiff's desire to litigate this suit in Washington, DC is eminently reasonable given that she lives here, and her residence in the District of Columbia gives her lawsuit a significant connection to this district.

Second, also connecting plaintiff's lawsuit to this district is the fact that one of the federal defendants is BOP, which is headquartered in Washington, DC. Plaintiff's allegation that BOP failed to take adequate steps to ensure compliance with its sexual-harassment and sexual-assault policies at FPC Alderson, despite being on notice about serious systemic problems of sexual abuse at that facility, directly implicates actors and decisions made in this district. *See State*, 304 F. Supp. 3d at 63 (noting that locus of decisionmaking that resulted in challenged agency action can be relevant to assessing case's relationship to judicial district). To be sure, the "mere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C.[,] is not determinative," *id.* at 64 (quoting *Shawnee Tribe v. United States*, 298

F. Supp. 2d 21, 25–26 (D.D.C. 2002)), and a plaintiff may not insist on litigating her lawsuit in Washington, DC solely because a federal agency is a defendant.  Nevertheless, this fact, combined with plaintiff's residence in Washington, DC, together suffice to give the lawsuit meaningful connection to this district.

In contrast, plaintiff has no connection to S.D.W.V. outside of her chance assignment by BOP to a prison located in that district.  For plaintiff, S.D.W.V. is a location with traumatic associations, as the site of not only her incarceration but also her persistent sexual harassment and sexual assault.  Given that association, plaintiff's desire to litigate her claims in this district, rather than in S.D.W.V., is both understandable and weighs heavily in favor of deferring to her choice of forum.  In sum, then, consideration of the first private-interest factor weighs strongly against transfer.

Although the federal defendants unduly minimize the instant lawsuit's relationship to this district, they are correct that the case has significant connections to S.D.W.V. such that some of the remaining private-interest factors weigh in favor of transfer.  Most obviously, the federal defendants seek to transfer this lawsuit to S.D.W.V., and, because FPC Alderson was the site of plaintiff's sexual harassment and assault by Grimes, her claims arose in that district, such that the second and third private-interest factors weigh in favor of transfer.

Citing the fact that plaintiff's claims arose in S.D.W.V., the federal defendants contend that the convenience of the parties and access to evidence likewise weigh in favor of transfer, as "[i]t follows that the relevant documents and witnesses would also be located in that area." Federal Defs.' Mem. at 6–7; *see also Mathis v. Geo Grp., Inc.*, 535 F. Supp. 2d 83, 87 (D.D.C. 2008) ("Courts have consistently transferred actions when the majority of witnesses live near the transferee forum . . . ." (omission in original) (quoting *Claasen v. Brown*, Civ. A. No. 94-1018,

10

1996 WL 79490, at *6 (D.D.C. Feb. 16, 1996))). This logic, however, does not actually play out as obviously as the federal defendants suggest.

In support of this contention, the federal defendants have submitted a declaration of Melissa Evans, a BOP Case Manager Coordinator at FPC Alderson, which position she has held since 1996. Federal Defs.' Reply, Ex. A, Decl. of Melissa Evans ("Evans Decl.") ¶ 1, ECF No. 18-1. In her declaration, Evans states that "FPC [Alderson] staff members will be needed as witnesses in the defense of the [instant] action and would be required to travel to the District of Columbia to testify," *id.* ¶ 4, and that "[p]hysical evidence, including paper files, that pertain to this case are located at FPC Alderson," such as "personnel files, administrative records, central files, medical records, and investigatory reports," *id.* ¶ 5.[5] Additionally, defendant Wilson "lives and works in the Southern District of West Virginia and has no connection to" Washington, DC. *Id.* at 7.[6] In short, the federal defendants' position is that because relevant witnesses reside in S.D.W.V., "[t]he private interest factors relating to the convenience of witnesses and access to sources of proof . . . weigh decisively in favor of transfer." *Id.*

No doubt, litigating this case in S.D.W.V. would be more convenient for those witnesses who are BOP employees working at FPC Alderson, and "paper files" relevant to plaintiff's claims, Evans Decl. ¶ 5, may be more readily accessed in that district. This is not a complete

---

[5] The federal defendants submitted the Evans Declaration as an exhibit to their Reply, *see* Federal Defs.' Reply, prompting plaintiff to move for leave to file a surreply and to conduct discovery relevant to the declaration. *See* Pl.'s Mot. for Discovery, to Hold Decision *Sub Curiae*, and for Leave to File Surreply, ECF No. 19. Specifically, plaintiff objected to the federal defendants' reliance on the "conclusory and untested *ipse dixit* of a government employee," *id.* ¶ 3, to show that relevant evidence and witnesses were located in S.D.W.V. This objection is unpersuasive, as it cannot come as a serious surprise to plaintiff that, in this case arising out of her alleged sexual harassment and sexual assault while incarcerated at FPC Alderson, relevant documents would be kept at that facility and relevant witnesses would work there and live nearby. Plaintiff's request to conduct discovery, by deposing Evans, was therefore denied, *see* Min. Order (Mar. 25, 2021), although plaintiff's request to file a surreply to address the factual claims raised by the Evans Declaration—namely, that relevant witnesses and documents are located in S.D.W.V.—was granted, *see* Min. Order (Mar. 30, 2021).
[6] Defendant Grimes, who has not joined the federal defendants' motion to transfer, is incarcerated in Texas, and there is no indication that he has any connection to Washington, DC either. *See* Federal Defs.' Mem. at 7 n.5.

11

picture of the relevant witnesses and evidence, however.  Presumably, documents produced in discovery will be processed and viewed electronically, no matter where the actual original records are stored.  "With respect to the location of documents, in this digital age of easy and instantaneous electronic transfer of data, the Court does not find that the 'ease of access to sources of proof' factor carries any weight in the transfer analysis." *Wyandotte Nation v. Salazar*, 825 F. Supp. 2d 261, 271 (D.D.C. 2011); *see also H & R Block,* 789 F. Supp. 2d at 83 ("[T]echnological advances have significantly reduced the weight of the ease-of-access-to-proof factor." (alteration in original) (quoting *Nat'l R.R. Passenger Corp. v. R. & R. Visual, Inc.*, No. 05-822, 2007 WL 2071652, at *6 (D.D.C. July 19, 2007))).

Moreover, as to witnesses, the federal defendants acknowledge that "[i]t is unclear how many witnesses might be relevant to this case," Def.'s Mem. at 7—and other potentially available evidence and witnesses are not located in S.D.W.V.  For instance, plaintiff notes that "S.B.," "C.L.," and a "Ms. Gabbison" are potential witnesses, as other alleged victims of Grimes, but none of them lives in S.D.W.V.  Pl.'s Opp'n at 19.  Instead, plaintiff speculates that S.B. is most likely incarcerated in Florida, C.L. is most likely incarcerated in Kentucky, and Gabbison most likely resides in Massachusetts.  *See id.*  As noted, C.L. filed an administrative grievance with BOP and thus her testimony and other evidence she could provide may be relevant to plaintiff's claims against the federal defendants, in particular to demonstrating that the federal defendants were on notice about Grimes, in particular, and a culture of sexual harassment and abuse, more generally, at FPC Alderson.  For similar reasons, testimony and evidence from S.B. and Gabbison would be relevant to plaintiff's case against the federal defendants.[7]

---

[7] The identities of S.B. and Gabbison are not entirely certain, as few details about them are provided in plaintiff's filings.  Given that S.B. is identified by a pseudonym, she is likely another FPC inmate who was victimized by Grimes, *see supra* note 2 and accompanying text, which conclusion is bolstered by the fact that in 2019, an anonymous plaintiff identified as "S.B." sued Grimes, BOP, and FPC Alderson officials in S.D.W.V.,

12

That these potential witnesses are not located in S.D.W.V. takes much of the force out of the federal defendants' argument that convenient access to witnesses and evidence favors litigating plaintiff's claims in S.D.W.V. Since those witnesses are scattered across the Eastern United States, the lawsuit's transfer to S.D.W.V. would impose substantial personal burden on those witnesses as well as administrative burden on BOP to transfer those witnesses who are incarcerated at other BOP facilities. Thus, the instant lawsuit will impose some inconvenience on a subset of witnesses no matter in which district this litigation proceeds. *See H & R Block*, 789 F. Supp. 2d at 83 (noting that convenience-of-the-witnesses factor did not weigh strongly in favor of transfer "because non-party witnesses, whose convenience carries the most weight in the analysis, are likely to be drawn from various districts around the country'"). Consequently, considerations of convenience with respect to witnesses and evidence weigh neither for nor against transfer.

The final remaining private-interest factor, the convenience of the parties, as distinct from the convenience of the witnesses, is also neutral. Although the federal defendants would prefer to litigate plaintiff's claims in S.D.W.V., they will be minimally inconvenienced by litigating them in this district, as they will be represented by a government attorney in any event. Litigating the instant lawsuit in S.D.W.V. would pose a more significant inconvenience for plaintiff, on the other hand, as her counsel is located in Baltimore, Maryland, such that her current counsel would need to travel to S.D.W.V. or else she would need to find new counsel. "[T]he location of counsel carries little, if any, weight in an analysis under § 1404(a)," *State*, 304

---

based on allegations that Grimes sexually assaulted her, in violation of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the FTCA, *see* Compl., ECF No. 1, *S.B. v. Wilson et al.*, No. 1:19-cv-00773 (S.D.W. Va.). Plaintiff's reference to "Gabbison" is likely a typographical error meant to refer to Paulette Gabbidon, who in 2019 filed a similar lawsuit against Grimes, BOP, and FPC Alderson officials. *See* Compl., ECF No. 1, *Gabbidon v. Wilson et al.*, No. 1:19-cv-00828 (S.D.W. Va.).

13

F. Supp. 3d at 66) (quoting *Reiffin*, 104 F. Supp. 2d at 52 n.7, however, and this fact is therefore accorded no weight in the private-interest analysis.

On balance, the private-interest factors weigh against transfer. Most importantly, plaintiff seeks to litigate her claims in her home district and has compelling reason for wishing not to return to S.D.W.V., such that her preference is entitled to significant weight. Litigating plaintiff's lawsuit in this district will impose some inconvenience on witnesses who are located in S.D.W.V., but given that plaintiff's potential witnesses are scattered from Kentucky to Massachusetts to Florida, any district to host this litigation will impose inconvenience on some of the witnesses.

### B.     Analysis of Public-Interest Factors

Having established that the private-interest factors weigh against transfer, the public-interest factors are now considered. Three public-interest factors are generally considered in determining whether transfer is appropriate under 28 U.S.C. § 1404(a): "(1) the transferee forum's familiarity with the governing laws . . . ; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *City of W. Palm Beach*, 317 F. Supp. 3d at 153 (quoting *Foote v. Chu*, 858 F. Supp. 2d 116, 123 (D.D.C. 2012)); *see also Atl. Marine*, 571 U.S. at 62 n.6. Two of these factors weigh slightly in favor of transfer and the third weighs against transfer.

The first public-interest factor, this Court's and S.D.W.V.'s respective familiarity with the governing law, "is generally applied in cases," like this one, "that implicate state law, with which federal courts are not equally familiar." *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 78 (D.D.C. 2013). This factor favors transfer, but only slightly, and less than the federal defendants propose. As the parties agree, the substantive tort law of West Virginia will govern plaintiff's FTCA claims against the federal defendants, *see* Federal Defs.' Mem. at 4;

14

Pl.'s Opp'n at 6, and may govern plaintiff's common law tort claims against defendant Grimes as well.[8]  At first blush, this fact, combined with the observation that federal courts in West Virginia are likely more familiar with West Virginia law than is this Court, suggests that this factor favors transfer.  Five of the tort claims that plaintiff pleads against the federal defendants under the FTCA—negligence; negligent training, supervision, and retention; civil assault; civil battery; and intentional infliction of emotional distress—however, are substantively identical in West Virginia and Washington, DC.  *See* Pl.'s Opp'n at 6–9 (comparing West Virginia's and the District of Columbia's respective leading cases on these five torts).

Negligent infliction of emotional distress is the one tort that plaintiff pleads against the federal defendants that is substantively different in West Virginia and the District of Columbia. Pursuant to West Virginia law, "a defendant may be held liable for negligently causing a plaintiff to experience serious emotional distress, after the plaintiff witnesses a person closely related to the plaintiff suffer critical injury or death as a result of the defendant's negligent conduct, even though such distress did not result in physical injury, if the serious emotional distress was reasonably foreseeable." *Heldreth v. Marrs*, 425 S.E.2d 157, 161 (W. Va. 1992).  Under District of Columbia law, in contrast, "a plaintiff may recover for negligent infliction of emotional distress if the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810–11 (D.C. 2011) (en banc).

---

[8] Plaintiff's Eighth Amendment claims are governed by federal constitutional law, application of which this Court and S.D.W.V. are presumed to be equally adept. *Rossville*, 453 F. Supp. 3d 388.

These legal tests appear to be materially different, but any difference may be readily identified and applied. [9] As the Supreme Court has observed, "in any event, federal judges routinely apply the law of a State other than the State in which they sit." *Atl. Marine Constr. Co.*, 571 U.S. at 67.

The second-public interest factor, the relative congestion of the would-be transferor and transferee courts, weighs considerably against transfer. The federal defendants' claim that the factor is "neutral" because "both districts have busy dockets," Federal Defs.' Mem. at 5, elides the considerable difference in average caseload between this District and S.D.W.V. For the twelve-month period ending September 30, 2020, this District had 373 pending civil cases per judge, *see* Judicial Business 2020, Administrative Office of the U.S. Courts, Table C, U.S. Dist. Courts—Civ. Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending September 30, 2019 and 2020, at 2, compared with 555 pending cases per judge in S.D.W.V., *see id.* at 28, representing a 49 percent greater caseload per judge in S.D.W.V. compared with this District.[10] In addition, the median time between the filing and disposition of a case in this Court is 5.8 months, while it is 62.7 months in S.D.W.V.—a more than tenfold increase in the time to final disposition as compared with this District. *See* Judicial Business 2018, Administrative Office of the U.S. Courts, Table C-5, U.S. Dist. Courts—Median Time Intervals from Filing to Disposition of Civ. Cases Terminated, by District and Method of

---

[9] The federal defendants also argue that there is another difference between substantive tort law in West Virginia and the District of Columbia, namely that the District of Columbia is a pure contributory negligence jurisdiction whereas West Virginia applies the doctrine of comparative negligence. Federal Defs.' Reply at 2–3 (citing *Massengale v. Pitts*, 747 A.2d 1029, 1031 (D.C. 1999); *Bradley v. Appalachian Power Co.*, 256 S.E.2d 879 (1979)). Yet, the federal defendants acknowledge that "it is uncertain whether comparative fault will be relevant in this case." *Id.* at 3. Merely that a difference exists between West Virginia and District of Columbia law with respect to a doctrine whose application to the instant case is "uncertain," indeed speculative, is not particularly helpful or relevant to the analysis of this factor. In any event, if this difference turns out to be relevant, again, once identified, West Virginia's comparative negligence law may be readily applied.

[10] The Administrative Office's Judicial Business 2020 Report and accompanying tables are available at *Judicial Business 2020*, U.S. COURTS, https://www.uscourts.gov/statistics-reports/judicial-business-2020 (last visited Apr. 15, 2021).

16

Disposition, During the 12-Month Period Ending September 30, 2018, at 1–2; *see also, e.g.*, *Foote v. Chu*, 858 F. Supp. 2d at 123 (relying on median time from filing to disposition in analyzing second public-interest factor); *Neighbors Against Bison Slaughter v. Nat'l Park Serv.*, Civil Action No. 19-cv-3144 (BAH), 2019 WL 6035356, at *7 (D.D.C. Nov. 14, 2019) (same).[11] On account of those considerable differences, this factor weighs against transfer.

The third public-interest factor, "the local interest in deciding local controversies at home," *City of W. Palm Beach*, 317 F. Supp. 3d at 153, weighs slightly favor of transfer. To be sure, as the federal defendants insist, "[t]his action concerns allegations that officials of a federal correctional institution in West Virginia acted" unlawfully, Federal Defs.' Reply at 3, and the district in which the prison is located no doubt "has a local interest in litigation related to the BOP facility in its local community," *id.* (quoting *Harrist v. United States*, Civ. A. No. 2:13-009-JRG, 2013 WL 11331168, at *4 (E.D. Tex. Dec. 13, 2013). The federal defendants overstate S.D.W.V.'s "local interest" in resolving this controversy. As plaintiff rightly notes, because FPC Alderson is part of the nationwide BOP federal prison system, "[t]he inmates who are housed within any single facility operated by [BOP] could be sent to that facility from anywhere, and are unlikely to be local community residents." Pl.'s Opp'n at 10. Thus, although the events giving rise to the instant lawsuit occurred in S.D.W.V., the case nevertheless does not present a purely local dispute because one of the key actors, namely plaintiff—to say nothing of the other female inmates who were also allegedly victimized—are not and were not fully integrated members of the S.D.W.V. community.

---

[11] The federal defendants, perhaps recognizing the magnitude of these differences, suggest that "[t]hese statistics may not accurately reflect the true relative docket congestion of the two districts because the West Virginia court's docket remains impacted by two pending multidistrict litigations [("MDLs")] that involve tens of thousands of individual cases that were transferred there in 2012." Federal Defs.' Mem. at 6. They also propose that "[t]hese litigations appear to be winding down," *id.*, but offer no support for this conclusory and evidently speculative claim. In any event, that S.D.W.V. is managing two huge MDLs only bolsters the Court's conclusion that analysis of this factor weighs against transferring the instant case to S.D.W.V.

17

Moreover, plaintiff's Complaint alleges that her harassment and ultimate assault were a product of nationwide enforcement policies and procedures developed by defendant BOP. *See generally* Compl. ¶¶ 42–59; *see also supra* Part I.A. Thus, plaintiff's allegations implicate actors and decisions made in Washington, DC. Moreover, Grimes's other, geographically dispersed, victims also have an interest in the resolution of this lawsuit against the federal defendants, lending plaintiff's claims a national valence.

On balance, then, the public-interest factors are neutral as to transfer: two factors only slightly favor transfer, and one factor weighs against it. S.D.W.V.'s presumed greater facility with West Virginia law and S.D.W.V.'s local interest in resolution of this controversy weigh in favor of transfer, yet the Court hesitates to transfer plaintiff's lawsuit to a significantly busier judicial district, with judges facing a considerably greater caseload than judges in this district and taking on average much longer to a see a lawsuit through to final resolution.

## IV. CONCLUSION

For the foregoing reasons, the private-interest factors weigh against transfer and the public-interest factors weigh neither for nor against it. The federal defendants have therefore failed to "establish that the added convenience and justice of litigating in [their] chosen forum overcomes the deference ordinarily given to the plaintiff's choice," *Rossville*, 453 F. Supp. at 387 (quoting *Sheffer*, 873 F. Supp. 2d at 376), and their Motion to Transfer is accordingly denied.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: April 15, 2021

_____
BERYL A. HOWELL
Chief Judge